## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

VISION POWER LLC,  
a Florida limited liability company,

      Plaintiff,

v.

MIDNIGHT EXPRESS POWER BOATS, INC.,  
a Delaware corporation.

      Defendant.

Case No.

Hon.

**COMPLAINT FOR DAMAGES AND JURY DEMAND**

_____/

MARC L. NEWMAN (P51393)  
The Miller Law Firm, P.C.  
Attorneys for Plaintiff  
950 W. University Drive, Ste. 300  
Rochester, MI  48307  
(248) 841-2200  
_____/

## COMPLAINT FOR DAMAGES AND JURY DEMAND

Plaintiff, Vision Power, LLC, ("Vision Power") through its counsel, brings this action for damages and relief against Defendant Midnight Express Power Boats, Inc. ("Midnight Express") regarding the manufacture and sale of a defective Midnight Express Speedboat ("Speedboat") to Plaintiff, and Plaintiff suffered damage as a result of these acts.

### JURISDICTION AND VENUE

1. Jurisdiction of this Court arises pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301 et seq.

2. Plaintiff, Vision Power, LLC, is a Florida company with its principal place of business in Michigan.

1

3. Defendant is a Delaware corporation, licensed to do business in Florida with its principal place of business in Florida.

4. As Defendant does business in the state of Florida, and committed the acts that form the basis for this suit with the intent to cause effects in the state of Florida, this Court has personal jurisdiction over Defendant for the purposes of this action.

5. The Purchase and Sale Agreement provides that parties must submit to mediation prior to filing suit for causes of action stemming from the Purchase and Sale Agreement. Plaintiff and Defendant have engaged in discussions regarding this dispute through written correspondence prior to Plaintiff commencing this action in satisfaction of this requirement.

## FACTS COMMON TO ALL COUNTS

6. Midnight Express is a speedboat manufacturer and seller that specializes in customizable luxury speedboats that are designed for high-performance in rough seas.

7. Midnight Express has touted itself for its credibility, quality, and performance on its website. A printout of Midnight Express's website is attached as **Exhibit "A".** Midnight Express represents:

    a. "Midnight Express uses the most advanced construction techniques, combined with the newest technology available to bring the boat of your dreams to reality."

    b. "Midnight Express has a simple mission statement; to build the best quality, highest performing powerboats utilizing cutting-edge technology combined with ground breaking design."

    c. "We use the **highest quality** materials available to create your dream boat." (emphasis added)

    d.    "We are known around the world for its **rough water handling**. The United States Government, as well as many foreign governments, trust Midnight Express boats to protect their coasts and waterways no matter what the sea conditions. We use a double step hull design and an innovative and unique technology called ISR to ensure you stay dry during rough seas." (emphasis added)

8.    Midnight Express markets a range of models and options to allow a fully customizable experience in which Midnight Express tailors its boats to the specific needs and specifications of the customer.

9.    A Purchase and Sales Agreement was entered with Midnight Express on December 23, 2014 for the production and sale of a '34 Open speedboat ("the Speedboat"). The Purchase and Sale Agreement is attached as **Exhibit "B"**.

10.    Midnight Express was the designer, builder, and manufacturer of the Speedboat.

11.    The Speedboat was specifically equipped with the towing package that included polished stainless steel tow bits mounted on the bow and additional cockpit drains.

12.    Pursuant to the Purchase and Sale Agreement, Midnight Express was paid $354,410 for the Speedboat in installment payments.

13.    Vision Power intended to use the Speedboat for recreation and travel in domestic and international waters as well as to tow the Speedboat behind other vessels while the Speedboat was not in use. The intended uses were communicated to Midnight Express prior to the execution of the Purchase and Sales Agreement.

14.    The Speedboat is 34 feet in length, the hull and deck structure was constructed primarily of fiberglass, it featured three outboard engines, and it was designed to travel at high speeds ranging up to 90 mph. **Exhibit "B".**

15. The Speedboat featured a center console affixed to the deck of the boat that featured the equipment necessary to operate the Speedboat.  All navigation and steering equipment was housed in the center console. The center console held additional electronics and aluminum rails and was secured to the deck by a mounting system and was situated under a roof-like covering. The mounting system consisted of ¼ inch oval head machine screws with finishing washers. There was minimal, if any, bedding compound surrounding the console and no bedding compound on the screws.

16. Among the many additional features, the Speedboat featured white seating around the boat, stainless steel rod holders for fishing, a GPS system, and surround sound stereo system.

17. The Purchase and Sale Agreement contains a Manufacturer's Warranty.

18. Prior to the execution of the Purchase and Sales Agreement, the sales agent at Midnight Express was told that the Speedboat was to be towed behind a yacht and being towed would be one of its main functions.

19. Midnight Express, in response, expressly represented that the Speedboat would be suitable for towing behind a yacht.

20. Midnight Express stated that the Speedboat was stronger than other boats and would not need any time of reinforced rigging for towing as the towing equipment installed in the Speedboat would be suitable.

**DEFENDANT'S FAULTY DESIGN CAUSED CATASTROPHE**

21. On or about February 23, 2018, Vision Power employed a crew to operate a yacht (the "Vision") and to tow the Speedboat from Lyford Cay Marina in the Bahamas to Norman's Cay Exuma in the Bahamas.

22. Ted Cranshaw served as the captain of the crew. Mr. Cranshaw had been serving as the captain since December 2014. Mr. Cranshaw had substantial experience operating large yachts in international waters and towing boats comparable to the Speedboat. Mr. Cranshaw's extensive resume is attached as **Exhibit "C"**.

23. The additional four crewmembers had previously operated the Vision and towed the Speedboat.

24. Conditions on February 23 were clear and calm, with winds traveling east at approximately 10-14 miles per hour, and seas were 2-3 feet out of the west on the head of the Vision. There were scattered clouds, and the temperature was approximately 75 to 80 degrees.

25. The crew utilized their ordinary towing procedure that they had been using since at least June 2015. Midnight Express provided no warnings regarding towing procedure.

26. Vision Power's towing procedure provided for towing conditions and crew member requirements to ensure safe towing practices.

27. Towing procedure explicitly required that the crew use specific towing equipment purchased from Florida Rigging, which represented that the equipment purchased by Vision Power would be suitable for towing the Speedboat behind the Vision.

28. The Vision left Lyford Cay Marina and towed the Speedboat out of the channel on a tow of 40 feet. Upon leaving the channel, the crew extended the towline to full towing length and towed the Speedboat at approximately 16 knots, or about 18 mph. Notably, the Speedboat is designed to operate at speeds 70 mph *faster* than the tow speed, with the capability of traveling at speeds upwards of 90 mph.

29. Towing lines were attached to the Vision and were rigged to five tender screws affixed to the hull of the Speedboat.

30. At about 11:30 a.m., the crew of the Vision noticed that the center console of the Speedboat was not upright and appeared to have tipped backwards from its original standing position.

31. The crew brought the Vision to idle in order to examine the Speedboat. Upon inspection, the crew discovered that the entire console had been dislodged from the deck, and the Speedboat had been significantly damaged when the console dislodged.

32. The crew then lowered its speed and towed the Speedboat approximately 19 miles to safety to Norman's Cay at approximately 10 knots, or about 11 mph.

33. Upon arriving at Norman's Cay, the crew anchored the Vision, and secured the center console of the Speedboat with ropes with additional lines to prevent additional damage.

34. It was at this time in Norman's Cay that the full extent of the damage could be fully assessed.

35. When the center console dislodged, its components were scattered across the Speedboat, and the shift of the heavy center console destabilized the Speedboat. As a result, the Speedboat suffered extensive damage that completely destroyed the Speedboat and rendered it unusable. A Report of Inspection, including photographs of some of the damage are attached as **Exhibit "D"**. A non-exhaustive list of damages is as follows:

    a. The electrical distribution panel inside the console was dislodged and damaged.

    b. The steering system reservoir was on its side and dislodged.

    c. The breakers and battery isolator panel was dislodged and adrift.

    d. The battery box featuring the switches was dislodged and adrift.

e. Wiring was shredded, disorganized, and running out on the port deck.

f. Batteries were broken apart and distributed across the deck.

g. Damage was found under the port seating.

h. Upholstered seating had been damaged and was on the deck of the boat.

i. Starboard coaming mounting brackets were bent and damaged. The starboard upholstered coaming was further noted on the deck.

j. Seating cushions for the aft were torn and damaged.

k. Upholstery on the port coaming was damaged.

l. Towing fasteners affixed to the head of the boat had been ripped upward through the fiberglass and were sheared in two.

m. The forward part of the console and hatch were damaged at the upper and lower hinges and was damaged along the forward corners.

n. The door for access under the console was damaged.

o. The aft bulkhead was cracked.

p. The panel with the windlass breaker was dislodged and adrift.

q. Faucets at the sink had been broken off.

r. Gel coating was damaged on the starboard bulwarks, port aft corner, and starboard aft corner, top-aft edge.

s. Shredded fiberglass, wiring, and components were strewn about the deck.

t. The stainless steel handrail on the aft seating was scarred and damaged.

u. The starboard aft floodlight was missing, and fiberglass surrounding the area was damaged.

v. Rod holders located on the aft had been damaged and partly broken off.

    w.    The aluminum frame was missing its gel coating and was scraped.

    x.    The helmsman's seat was torn off, with bent aluminum hinges.

    y.    The aluminum grab railing was bent and deformed.

    z.    Footrests were scraped and damaged.

    aa.    The fiberglass was damaged on the port and starboard forward lower corners and aft corners.

36. The console top was extremely large, and the entire console unit was extraordinarily heavy. Electronics and aluminum rails added additional weight to the console.

37. The center console could have been properly affixed using ordinary boat construction practices. However, Midnight Express declined to use basic boat building practices in order to properly construct the Speedboat at great risk to the consumer.

38. The poorly designed mounting system was insufficient to secure the heavy weight of the center console while being used under normal operating conditions.

39. No bedding compound surrounded the edges of the console, and very limited bedding compound secured the screws. Bedding compound would have helped secure the console and would have provided waterproofing to the screws. However, Midnight Express failed to use such product to properly affix the center console.

40. Rather than properly use screws that could reach the aluminum plate under the hull deck, Midnight Express used short ¼ inch screws with washers. Only one ½ inch screw was found affixing the massive console into the deck.

41. Inspections reveal that Midnight Express designed, manufactured, and sold a Speedboat that did not comply with basic boat building standards. As a result, the center console dislodged while the Speedboat was being towed under normal towing procedures in clear

and calm conditions. The boat was being towed at speeds substantially lower than the Speedboat is purportedly designed to travel.

42. The center console dislodged due to its poor design and attachment to the hull deck. When the center console dislodged, the Speedboat suffered extensive damage that could have been prevented had Midnight Express properly affixed the center console with additional materials and used lighter materials more suitable for the center console. The detached console and loose components further destabilized the boat.

43. The Speedboat was critically damaged, and Vision Power has suffered substantial losses as a result. The Speedboat has not been able to be used since the date of the incident.

44. Furthermore, Midnight Express failed to inform the purchaser that any specific towing procedure should be used and failed to inform the purchaser that the center console could dislodge at any point due to Midnight Express's manufacturing techniques. Instead, Midnight Express produced a faulty and extremely dangerous Speedboat that could have significantly injured anyone in the surrounding vicinity.

45. Midnight Express has taken no steps to ensure that this faulty design will be corrected and has failed to warn other owners that using its product could lead to catastrophe.

46. Moreover, Vision Power has sustained substantial damages for the purchase price of the boat, as well as for the storage of the boat since the incident.

## COUNT I
## BREACH OF UCC AND MAGNUSON-MOSS IMPLIED WARRANTY OF MERCHANTABILITY AND USAGE OF TRADE

47. Plaintiff re-alleges paragraphs 1 through 46 as fully set forth herein.

48. The cause of action alleged in this Count is brought pursuant to Florida Statute 672.314, et seq., and the Magnuson-Moss Warranty Act, 15 U.S.C. 2301, et seq.

49. The Speedboat was a "consumer product" as defined by the Magnuson-Moss Act, 15 U.S.C. 2301, et seq. because the Speedboat was tangible personal property distributed into commerce normally used for personal, family, or household purposes.

50. Both the original purchaser and Vision Power were "consumers" as defined by the Magnuson-Moss Act, 15 U.S.C. 2301, et seq.

51. Midnight Express, was the commercial manufacturer, supplier, merchant, and/or seller of the Speedboat as defined by the Magnuson-Moss Warranty Act, 15 U.S.C. 2301, et seq. and Florida Statute 672.314.

52. Midnight Express impliedly warranted that the Speedboat was of merchantable quality, fit, safe, and in a proper condition to be used with reasonable safety, efficiency and comfort.

53. Midnight Express warranted that the vessel would pass without objection in the trade; was of fair average quality; was fit for the ordinary purpose for which it was to be used as a high quality speedboat suitable for sea conditions and towing; would run as vessels similar in kind, price and quality; was adequately and accurately built to specifications; and would conform to all affirmations of fact made by Midnight Express, regarding the quality and performance of the boat.

54. Plaintiff was a foreseeable purchaser and foreseeable user, who used the Speedboat for the ordinary purpose for which it was intended by using and towing the Speedboat using its ordinary procedure.

55. The Speedboat, when manufactured, sold and/or delivered by Midnight Express, was in a defective condition and was unreasonably dangerous to the user and consumer.

56. The Speedboat was not of merchantable quality and was unfit, unsafe, and unusable for the ordinary purpose for which it was intended.

57. The Speedboat was non-conforming as described in paragraphs 36 to 44.

58. Midnight Express breached the implied warranty of merchantability and usage of trade by failing to properly design, inspect, test, construct, manufacture, and outfit the Speedboat and by delivering the Speedboat, which was unfit for ordinary use.

59. The Speedboat failed to function properly when the crew was towing the Speedboat behind the Vision. The center console should not have dislodged from the boat or caused the damage incurred when being towed in the conditions present on February 28, 2018. Midnight Express used subpar boat building techniques to construct the Speedboat and affix the center console to the hull deck.

60. The Speedboat is now out of service due to non-conformities, design, and construction defects as of the date of institution of this action.

61. The Speedboat was dangerous and failed to operate according to Midnight Express's design specifications, which included towing equipment.

62. The cause and origin of the damages was a result of Midnight Express' breach of the implied warranty of merchantability imposed by Fla. Stat. 672.314 et seq., and the Magnuson-Moss Warrant Act, 15 U.S.C. 2301, et seq.

63. As a direct and proximate result of Midnight Express' breach of warranty, Vision Power has suffered damages to the full extent of the purchase price of the vessel.

**COUNT II**
**BREACH OF UCC AND MAGNUSON-MOSS IMPLIED**
**WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE**

64. Plaintiff re-alleges paragraphs 1 through 63 as fully set forth herein.

65. The cause of action alleged in this Count is brought pursuant to Florida Statute 672.314, et seq., and the Magnuson-Moss Warranty Act, 15 U.S.C. 2301, et seq.

66. The Speedboat was a "consumer product" as defined by the Magnuson-Moss Act, 15 U.S.C. 2301, et seq. because the Speedboat was tangible personal property distributed into commerce normally used for personal, family, or household purposes.

67. Both the original purchaser and Vision Power were "consumers" as defined by the Magnuson-Moss Act, 15 U.S.C. 2301, et seq.

68. Midnight Express, was the commercial manufacturer, supplier, merchant, and/or seller of the Speedboat as defined by the Magnuson-Moss Warranty Act, 15 U.S.C. 2301, et seq. and Florida Statute 672.314.

69. Midnight Express agreed to and did design, build, and manufacture the Speedboat for the purchaser for a price of $354,410.

70. Midnight Express had reason to know that the Speedboat was manufactured for a specific purpose and the buyer relied on Midnight Express to provide a suitable product. Namely, as evidenced by the towing equipment that Midnight Express provided for in the Purchase and Sale Agreement attachment, Midnight Express knew that this boat would be towed behind another vessel and designed it to do so. Furthermore, Midnight Express knew or should have known that that the Speedboat would be used for the particular purpose of being towed and operated in ocean conditions.

71. Midnight Express warranted that the Speedboat was reasonably fit for Vision Power's intended use.

72. Vision Power was a foreseeable purchaser and a foreseeable user, who use the Speedboat for a purpose for which it was intended.

73. At all times material hereto, Midnight Express breached the Implied Warranty of Fitness for a Particular Purpose by failing to properly design, inspect, test, construct, and manufacture, and outfit the vessel and by delivering a vessel that was unfit for Vision Power's intended use.

74. As a direct and proximate cause of Midnight Express' breach of warranty, Vision Power has suffered damages including the full purchase price of the Speedboat and consequential and incidental losses.

75. Midnight Express' breach of warranty also deprived Vision Power of the benefit it bargained for when purchasing the vessel. Vision Power was not sold the vessel it bargained for and has, therefore, been damaged to the full extent of the Speedboat's purchase price, consequential and incidental costs as well as attorneys' fees pursuant to the Magnuson Moss Warrant Act, 15 U.S.C. 2301, et seq.

## COUNT III
## BREACH OF UCC AND MAGNUSON-MOSS
## EXPRESS WARRANTY

76. Plaintiff re-alleges paragraphs 1 through 75 as fully set forth herein.

77. The cause of action alleged in this Count is brought pursuant to Florida Statute 672.314, et seq., and the Magnuson-Moss Warranty Act, 15 U.S.C. 2301, et seq.

78. The Speedboat was a "consumer product" as defined by the Magnuson-Moss Act, 15 U.S.C. 2301, et seq. because the Speedboat was tangible personal property distributed into commerce normally used for personal, family, or household purposes.

79. Both the original purchaser and Vision Power were "consumers" as defined by the Magnuson-Moss Act, 15 U.S.C. 2301, et seq.

80. Midnight Express, was the commercial manufacturer, supplier, merchant, and/or seller of the Speedboat as defined by the Magnuson-Moss Warranty Act, 15 U.S.C. 2301, et seq. and Florida Statute 672.314.

81. The original purchaser entered into written and/or oral purchase and warranty agreements with Midnight Express. The Purchase and Sale agreement required the purchaser to pay substantial consideration for the purchase and delivery of the Speedboat.

82. Midnight Express made representations regarding the quality of the boat that induced the purchaser into entering into the Purchase and Sale Agreement.

83. Midnight Express' representations constituted express warranties within the contemplation of Fla. Stat. 673.313. et seq. and the Magnuson-Moss Warrant Act, 15 USC 2301 et seq., which became the basis of the bargain between the parties.

84. Midnight Express' express warranties were made to the purchaser orally, in writing, contract, statement, purchase order, description, advertisement, brochure, course of conduct and trade in usage and by other methods to be revealed through the course of discovery and warranted a minimal level of quality and future performance of the vessel.

85. At all times material hereto, Midnight Express breached it express warranties by, among other things, failing to properly design, inspect, test, construct, manufacture, and outfit the Speedboat. Specifically, Midnight Express:

    a. Failed to produce a vessel fit for the ordinary use of the consumer
    b. Failed to adequately affix the center console to the hull deck in a manner that would ensure it would stay secured to the deck and not cause injury to the Speedboat or individuals in the vicinity

    c.    Failed to use proper boat building technique by using short screws that did not reach the aluminum under the hull deck with virtually no bedding compound

    d.    Failed to adequately design the center console at a secured and would not destabilize the Speedboat

    e.    Failed to provide any limiting instruction to the purchaser that would inform the purchaser that specific towing procedure was necessary to tow the Speedboat due to Midnight Express' manufacturing standards

86. As of the date of filing, the Speedboat is completely damaged and unusable. Midnight Express has requested that Vision Power refrain from repairing or modifying the Speedboat during the pendency of the proceedings.

87. The cause of the damage was Midnight Express's failure to design, manufacture, construct, furnish, and/or sell the vessel in conformity with the express warranties.

88. As a direct and proximate cause of Midnight Express' breach, Vision Power has suffered substantial damages, and Midnight Express has deprived Vision Power of the use of the vessel.

**COUNT IV**
**BREACH OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**

89. Plaintiff re-alleges paragraphs 1 through 88 as fully set forth herein.

90. This cause of action alleged in this count is brought pursuant to Florida Statute 501.201 et seq.

91. Midnight Express engaged in deceptive acts or unfair practices that were likely to mislead consumers by manufacturing the Speedboat, which was unsuitable for towing under average conditions, despite representing to Vision Power that it would be safe to use the Speedboat in that fashion.

92. Vision Power was a consumer of the Speedboat who relied on Midnight Express to provide truthful information regarding the Speedboat and manufacture the Speedboat pursuant to Midnight Express's representations.

93. Instead, Midnight Express manufactured the Speedboat that was not suitable for towing and used subpar boat manufacturing techniques that caused the center console to dislodge.

94. Midnight Express was engaged in trade or commerce by advertising that the Speedboat was suitable for towing, soliciting the consumer, Vision Power, to make the purchase of the Speedboat, providing the Speedboat to Vision Power through Vision Power's purchase.

95. As a result of Midnight Express's deceptive acts or unfair practices, Vision Power has suffered substantial damages, and Midnight Express has deprived Vision Power of the use of the vessel.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays for a judgment in its favor as follows:

A. Determining that Defendant has breached its express warranties, implied warranty of merchantability, and implied warranty of fitness for a particular purpose;

B. Awarding monetary damages, consequential damages, incidental damages for Defendant's breach;

C. Requiring Midnight Express to provide appropriate warning to all consumers that its manufacturing deficiencies could lead to substantial injury;

D. Awarding reasonable attorney's fees;

E. Providing any other equitable relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff respectfully demands trial by jury on all issues so triable.

Dated: July 24, 2018

Respectfully submitted,

*/s/* Marc L. Newman
Marc L. Newman (P51393)
The Miller Law Firm, P.C.
950 W. University Dr., Ste. 300
Rochester, MI 48307
(248) 841-2200
mln@millerlawpc.com


/s/James R. Dunn
James. R. Dunn
FBN 40950
Local Counsel
James R. Dunn, P.A.
200 SE 6th Street
Suite 402
Fort Lauderdale, FL 33301
(954) 684-3535
James@AttorneyJamesDunn.com